## THE MINNEHAHA.

### (Circuit Court of Appeals, Second Circuit. July 1, 1903.)

#### No. 182.

**1. COLLISION—STEAMSHIP AND TUG—PREMATURE FASTENING OF TOWLINE.**
    Evidence considered, and *held* to support the finding of the trial court that the sinking of a tug in collision with a large steamship, from which she had just taken a line to assist her in docking, was not due to fault of the steamship in making fast the line prematurely and without orders from the tug while it was being paid out, but to the negligent navigation of the tug in getting under the bow of the steamship, and in failing to keep out of the way, although the ship was moving with only sufficient speed to give her steerageway.

Appeal from the District Court of the United States for the Eastern District of New York.

For opinion below, see 115 Fed. 852.

Appeal by libelants from a decree of the District Court for the Eastern District of New York dismissing the libel, entered April 23, 1902. The opinion of the District Court will be found reported in 115 Fed. 852.

James J. Macklin and La Roy S. Gove, for appellants.

J. Parker Kirlin and James T. Kilbreth, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. But little need be added to the comprehensive opinion of the District Judge. The Minnehaha is one of the largest steamships entering the port of New York. She is 600 feet in length and 65 feet beam. The tug America is about 80 feet in length.

On the morning of September 18, 1900, the tug approached the steamship to assist her in docking at Pier 39 North river, and called for a line. After the line was made fast the tug got under the stem of the steamer, was rolled over and sank and two of her crew were drowned. The libel now under consideration was filed to recover damages for injury to the tug.

The libel alleges that after the hawser was made fast to the bitts on the stern of the tug and when 60 or 70 feet had been passed out in the customary way it was suddenly made fast to the steamship without any warning to the tug, thus bringing the tug under the port bow of the steamship capsizing her and doing her serious damage.

The fourth paragraph of the libel is as follows:

"Fourth. That it is and has been the custom and practice for many years when steam tugs assist in docking vessels in the harbor of New York, and when passing out the hawser to the steam tug or steam tugs, to continue the paying out of the same until the person in charge of the steam tug would signal or inform those on the steamer to cease doing so and thereupon make fast the hawser on said steamer, which custom and practice on the occasion aforesaid was entirely disregarded, thus bringing about the damage which the said steam tug sustained."

The burden was, then, upon the libelants to prove these allegations. Not only have they failed to sustain the burden, but the preponderance of proof establishes the steamship's freedom from fault in paying out the hawser.

The controversy turns upon two questions of fact: First, was the line too short? And, second, if it were too short was it the fault of the steamship or of the tug?

The libelants' witnesses all testified that, in the circumstances detailed, it was the custom of the port to give the tug 35 or 40 fathoms of line. The witnesses for the steamship testified that this was about the length of line given to the American. They also testified to seeing the tug 80 feet ahead of the steamship's stem, which was sufficient space to enable her to avoid being run down.

The court can almost take judicial notice of the fact that a tug 80

feet in length, with its powerful machinery and ability to execute any maneuver with the greatest celerity, could not, unless guilty of negligence, have been run down by a steamship, moving only fast enough to make steerageway, when the tug had room enough to keep her stern 80 feet in front of the bow of the steamship. On the other hand, the master of the America testified that he received only 70 or 75 feet of line. There was, therefore, a dispute upon a question of fact with the preponderance in the number of witnesses and their opportunity for observation, in favor of the steamship. Not only so, but the claimant's version is supported by a strong presumption in its favor.

The libelants insist that the tug should have received over 200 feet of hawser. That about this length was required is admitted by the claimant. The requirements of the situation were well known to all concerned. Is it probable that the experienced mariners on the steamship would have given the tug a third only of the needed length? And is it to be believed that the men on the tug would have left the bitts if they had not been convinced that a sufficient length of line was out and properly fastened? Would the tug have gone ahead in the manner stated with no more dissent than that indicated in the testimony of her master? He says: "After my boat's stern brought up I tooted the whistle for more hawser and got none." This was after the tug was in extremis. It was then too late to save her.

Assuming, however, that the libelants are correct as to the length of the line, whose fault was it? The testimony is uncontradicted, though sharply criticised, that the Minnehaha's boatswain called out to the men on the tug to inform him when they had line enough and that, thereafter, a man on the tug called back to "make fast" and held up his hand as a signal to the same effect. The line was then made fast in response to this order from the tug. It is true that the only members of the tug's crew who could testify upon this subject were drowned, but the court was not justified in disregarding the steamship's testimony because it might have been contradicted. The situation called for careful scrutiny of the testimony and this it certainly received. It is enough to say that the controversy involves questions of fact which were decided by the judge who heard all of the 13 witnesses but 2, and we see no reason to disagree with his conclusions.

The decree of the District Court is affirmed with interest and costs.